**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF OHIO**
**EASTERN DIVISION**

**BARBARA LYNN HAYNES,**                    Case No. 5:18 CV 2827

      Plaintiff,

      v.                                        Magistrate Judge James R. Knepp II

**COMMISSIONER OF SOCIAL SECURITY,**

      Defendant.                          MEMORANDUM OPINION AND ORDER

## INTRODUCTION

Plaintiff Barbara Lynn Haynes ("Plaintiff") filed a Complaint against the Commissioner of Social Security ("Commissioner") seeking judicial review of the Commissioner's decision to deny disability insurance benefits ("DIB"). (Doc. 1). The district court has jurisdiction under 42 U.S.C. §§ 1383(c) and 405(g). The parties consented to the undersigned's exercise of jurisdiction in accordance with 28 U.S.C. § 636(c) and Civil Rule 73. (Doc. 11). For the reasons stated below, the undersigned affirms the decision of the Commissioner.

## PROCEDURAL BACKGROUND

Plaintiff filed for DIB in March 2016, alleging a disability onset date of February 4, 2015. (Tr. 140-43). Her claims were denied initially and upon reconsideration. (Tr. 77-79, 81-83). Plaintiff then requested a hearing before an administrative law judge ("ALJ"). (Tr. 88-89). Plaintiff (represented by counsel), and a vocational expert ("VE") testified at a hearing before the ALJ on April 10, 2018. (Tr. 28-48). On May 9, 2018, the ALJ found Plaintiff not disabled in a written decision. (Tr. 13-23). The Appeals Council denied Plaintiff's request for review, making the hearing decision the final decision of the Commissioner. (Tr. 1-3); *see* 20 C.F.R. §§ 404.955, 404.981. Plaintiff timely filed the instant action on December 10, 2018. (Doc. 1).

**FACTUAL BACKGROUND**

Personal Background and Testimony

  Plaintiff was born in 1965, making her 52 years old at the time of the hearing. (Tr. 31-32, 140). She alleged disability due to herniated discs in her neck, high blood pressure, and macrocytosis. (Tr. 159). At the hearing, Plaintiff testified she weighed 265 pounds. (Tr. 42).

  Plaintiff had past work as an insurance clerk. *See* Tr. 32-33, 42-43. The job required "minimal" lifting and working at a desk up to ten hours per day with "a lot of back and forth. . . with [her] head" moving between two computer monitors. (Tr. 34). Plaintiff believed she could not work her prior job due to neck pain; the pain was a "burning" sensation which caused her hands to shake after sitting and looking at the computer. *Id*. This sensation radiated to her shoulders and back and arose after sitting for approximately a half-hour; she would then need to get up and move around for approximately five to ten minutes. (Tr. 34-35). As a result, Plaintiff had trouble completing her work. (Tr. 36). Her typing ability reduced from 60 words per minute to 20 due to the pain in her neck, shoulders, and arms. *Id*.

  Plaintiff lived with her husband. (Tr. 32). She was able to drive but did not have a license. *Id*. In a typical morning, Plaintiff took medication (muscle relaxers), showered, rested, made coffee, and then used a heating pad or TENS unit. (Tr. 37). Plaintiff cooked simple meals, usually microwavable, because she did not stand long enough to cook a meal. (Tr. 37-38). She could grocery shop for twenty to twenty-five minutes before her back started "throbbing". (Tr. 38). Her stepson and husband did most of the cooking, cleaning, and laundry. *Id*. She needed assistance styling her hair (Tr. 40-41), but was able to dress herself (Tr. 42).

  Plaintiff estimated she could stand for twenty minutes before needing to sit. (Tr. 38). She could walk for approximately fifteen to twenty minutes at a time. (Tr. 38-39). Plaintiff had

difficulty lifting, estimating she could reach above her head for five minutes. (Tr. 41). She was "pretty good" at frontal and "side to side" reaching so long as she was not lifting. *Id*.

Plaintiff testified that she did not have difficulty communicating or socializing with friends or coworkers. (Tr. 42). She experienced some anxiety in the past but was not receiving any treatment at the time of the hearing, including medications. *Id*.

Relevant Medical Evidence

*Prior to Alleged Onset Date*

In July 2012, Mark Cecil, M.D., performed an anterior cervical discectomy with interbody fusion based upon a diagnosis of a herniated nucleus pulposus (left paracentral) at C6-C7 with C7 radiculitis (left side). (Tr. 199). There was also a "[c]oexisting diagnosis of morbid obesity". *Id*.

In September 2014, Plaintiff underwent a hardware removal and anterior discectomy with interbody fusion at C5-C6 due to a diagnosis of adjacent segment disease manifesting as symptomatic herniated nucleus pulposus C5-C6 with C6 radiculitis (left side). (Tr. 201). At a post-operative follow-up later that month, Plaintiff reported feeling "100% better". (Tr. 294). In October, Plaintiff noted sharp pain when moving her neck from side to side, but reported her pain during the appointment at "0/10". (Tr. 299). Dr. Cecil noted she had "actually done quite well with resolution of her radicular pain" and "h[ad] some interscapular pain" but it was "not tremendously problematic for her." (Tr. 300). On examination, Plaintiff's neck "move[d] through a normal range of painless motion during routine conversation." *Id*. In November, Plaintiff reported some difficulty with overhead activities at her physical therapy sessions. (Tr. 217). On examination, she had a normal, painless, range of motion in her neck with no evidence of myelopathy (Tr. 217); she exhibited mild weakness and diminished range of motion in her left shoulder. (Tr. 218). X-rays

taken during the visit were unremarkable. *Id*. Dr. Cecil diagnosed concomitant impingement of the rotator cuff (left side) and recommended "aggressive physical therapy". *Id*.

In January 2015, Plaintiff returned to Dr. Cecil reporting burning pain in her neck and lower back aggravated by using her keyboard at work and alleviated by physical therapy and heat. (Tr. 319). The pain radiated to her lower back, mid back, left shoulder, and left buttock. *Id*. On examination, Plaintiff had positive straight leg raise on the left side and "slightly diminished" tibial anterior strength on the left side. (Tr. 320-21). Dr. Cecil prescribed medications and ordered x-rays. (Tr. 321). Later that month, Plaintiff reported that sitting intolerance from low back pain caused her to leave work early. (Tr. 323). On examination, she had normal strength in her lower extremities and low back pain with a straight leg raising test. *Id*. X-rays revealed normal alignment of the lumbar spine with age-related changes and facet arthropathy at the L4-L5 motion segment. *Id*.

A February 2, 2015 MRI of the lumbar spine revealed darkening of the disc on T2 at L3-L4 and L4-L5 consistent with degenerative disc disease. *See* Tr. 278. There was "at best mild subarticular lateral recess stenosis at these levels." *Id*.

*After Alleged Onset Date*

At a hematology appointment in late February 2015, Plaintiff had a normal gait and station on examination. (Tr. 245). She also had normal range of motion, strength, tone, and stature. *Id*.

Plaintiff treated with Dr. Cecil in July 2015. (Tr. 290-91). She reported low back pain and a fifteen-minute tolerance for sitting. (Tr. 290). Dr. Cecil found Plaintiff had painful reactions to forward flexion, side rotation, and hyperextension of the lumbar spine on examination. (Tr. 291). She had negative straight leg raises bilaterally, slightly diminished strength, and a normal gait. *Id*.

Dr. Cecil noted the etiology of Plaintiff's low back pain was "likely discogenic" and recommended facet blocks. *Id.*

Plaintiff had lumbar nerve block injections in July and September 2015. (Tr. 262-63).

In September 2015, Plaintiff's primary care physician Son Dang, M.D., noted full range of motion in her neck. (Tr. 346). In October, Plaintiff reported "aching and throbbing" lower back pain to Dr. Cecil. (Tr. 274). On examination, Dr. Cecil found "no new nor progressive motor or sensory deficits." (Tr. 275). He also noted that the facet blocks were ineffective at relieving pain. *Id.* Plaintiff rose rapidly from a seated position, had a normal gait which was "not antalgic nor [was] it myelopathic". *Id.* He concluded no surgical intervention was necessary and prescribed medication for chronic pain. *Id.*

At a February 2016 follow-up for lower back pain, Dr. Cecil noted Plaintiff's neck "move[d] through a full and painless range of motion during routine conversation". (Tr. 273). She rose slowly from a seated position and had "some truncal inclination although she [was] with prompting able to assume and maintain an uncompensated neutral standing sagittal and coronal balance." *Id.* She had a normal gait and painful forward flexion and extension of the lumbar spine *Id.* She had full and painless rotation of the hips. *Id.* He opined that "as regards to cervical pathology", Plaintiff had "reached maximum medical improvement . . . and is doing quite well." (Tr. 273). Dr. Cecil referred Plaintiff to orthopedist Daniel Dorfman, M.D., for a physiatric evaluation. *Id.*

Plaintiff saw Dr. Dorfman in February 2016. (Tr. 302). She reported "nagging and throbbing" lower back pain with numbness and tingling in her left leg. *Id.* On examination, Plaintiff had tenderness over the lumbar region without focal trigger points. (Tr. 304). She did not have any SI joint, sciatic notch, or pyriformis tenderness. *Id.* Plaintiff had intact strength in all lower

extremity myotomes with negative seated straight leg raises (to 70 degrees) bilaterally. *Id*. She had full motion in her hips, knees, and ankles without reproduction of discomfort. *Id*. Dr. Dorfman diagnosed spondylosis (without myelopathy or radiculopathy) in the lumber region and connective tissue and disc stenosis of the intervertebral foramen at the L3-L4 level. *Id*. He referred Plaintiff for physical therapy and an electrodiagnostic evaluation of the left lower extremity. (Tr. 304-05). The nerve conduction study, performed in April 2016, was normal. (Tr. 327).

In March and May 2016, Dr. Dang found full range of motion in Plaintiff's neck and unremarkable upper and lower extremity examinations. (Tr. 342, 354). She had a normal psychological examination (mood and affect) at the March visit. (Tr. 354).

Plaintiff attended a consultative psychological examination with Sylvester Huston, Ph.D., in April 2016. (Tr. 331-36). When asked by Dr. Huston why she filed for disability benefits, Plaintiff noted she was "having problems with [her] neck and back". (Tr. 331-32). She detailed her family, occupational, legal, and physical health history (Tr. 332-33), and "denied difficulties associated with mental health" (Tr. 333). Plaintiff reported drinking coffee and cleaning prior to her appointment and reported that she "[did not] do a lot of anything anymore". *Id*. She performed household chores "with help". *Id*. Plaintiff also reported interests in shopping and vacationing but could no longer participate in these hobbies due to her health; she had a small and supportive group of friends and had a positive relationship with her family. *Id*.

On examination, Dr. Huston found Plaintiff neatly dressed, with a pleasant and cooperative demeanor. *Id*. Her affect was appropriate to her cooperative mood and she was very friendly. (Tr. 334). She appeared to have appropriate energy and activity levels. *Id*. Plaintiff reported "occasional difficulty with anxiety" during which she experienced tachycardia, tachypnea, psychomotor agitation, and diaphoresis. *Id*. Dr. Huston observed "[m]otor manifestations of anxiety were

apparent during the interview." *Id*. Plaintiff was fully oriented and tracked the flow of conversation during the 60-minute interview. *Id*.

Plaintiff treated with Beth Canfield, M.S.N., at Mercy Pain Medicine in June 2016 reporting neck and back pain, worse with standing or sitting for long periods. (Tr. 461). Ms. Canfield found Plaintiff was alert and oriented with a regular gait, negative toe raises, and positive heel raises. (Tr. 463). She had pain in her lumbar region with extension and hyperextension motion and negative straight leg raises in a seated position. *Id*. She had pain with extension in the cervical region and full strength in her upper and lower extremities. *Id*. Ms. Canfield diagnosed chronic pain syndrome, a disc bulge and mild canal stenosis at L3-L4, lumbar facet arthropathy, lumbar spondylosis, lumbar degenerative joint disease, low back pain without radicular component, and cervical pain. *Id*. She prescribed medications and instructed Plaintiff to "[k]eep as active as possible". (Tr. 464). These examination findings and diagnoses were unchanged in October and December 2016. *See* Tr. 453, 458.

Plaintiff established care with Benjamin Swisher, M.D., in November 2016. (Tr. 431). She reported doing well overall, other than chronic neck and lower back pain for which she went to pain management. *Id*. On examination, Plaintiff had a normal gait with full range of motion in all extremities. (Tr. 432).

Plaintiff treated with Ms. Canfield in April and August of 2017 for neck and back pain. (Tr. 442-44, 446-49). She reported the pain improved with heat and stretching. (Tr. 442, 446). She reported "minimal" benefit from daily use of a TENS unit in April (Tr. 446), and "moderate" benefit in August (Tr. 442). Her previous examination findings and diagnoses were unchanged. (Tr. 444, 448). Ms. Canfield recommended continued TENS use and prescribed medication. (Tr. 445, 449).

In August 2017, Plaintiff consulted with orthopedist Daniel Moretta, D.O. (Tr. 383-86). She reported low back and left buttock pain which radiated to her left mid-thigh. (Tr. 383). She also had numbness and tingling in the left thigh. *Id.* Her symptoms worsened with prolonged sitting and standing and improved with heat. *Id.* On examination, Plaintiff had a "slight decrease" in sensation over her anterolateral left thigh, but otherwise intact sensation bilaterally. (Tr. 383). She had full strength and negative straight leg raises. *Id.* Dr. Moretta diagnosed lumbar pain, recommended physical therapy, and prescribed medication. (Tr. 384). A lumbar x-ray taken that month revealed "normal appearing lumbar vertebrae". *Id.*

Plaintiff attended physical therapy for low back pain in September and October 2017. *See* Tr. 396-411. Plaintiff reported continued pain in her lower back, but her physical therapist noted she was responding to treatment. (Tr. 391, 394). She "self-released" from physical therapy in October. (Tr. 393).

Plaintiff consulted with pain management specialist Arsal Ahmad, M.D., in January 2018. (Tr. 416-19). She reported low back and neck pain, worse with prolonged standing and walking. (Tr. 416). She also had numbness, spasms, and a burning sensation in these areas. (Tr. 417). Plaintiff did not have relief from physical therapy or muscle relaxants. (Tr. 416). On examination, Plaintiff had a normal gait, balance, and tandem walk. (Tr. 418). She had a negative Romberg test and equivocal straight leg raising tests bilaterally. *Id.* There was no tenderness to palpation in the cervical spine and normal range of motion. *Id.* She had a restricted range of motion in the thoracic spine. *Id.* In the lumbar spine, she had tenderness to palpation in the lumbosacral junction and stability throughout. *Id.* Lumbar spine x-rays taken during the visit revealed mild multi-level degenerative changes. (Tr. 420). A lower extremity nerve conduction study performed later that month was normal. (Tr. 414).

Plaintiff was 67 inches tall and her weight remained in excess of 260 pounds after her alleged onset date. *See* Tr. 245, 271, 274, 289, 303, 342, 346, 353, 385, 443, 447, 462.

Opinion Evidence

In April 2016, Dr. Huston offered a functional assessment where he opined that he expected Plaintiff "to be able to understand and apply instructions in the work setting consistent with average intellectual functioning". (Tr. 336). Regarding Plaintiff's ability to maintain attention and concentration, persistence and pace, Dr. Huston found "[t]hough [she] may experience a subjective sense of reduced effectiveness in this area should her anxiety symptoms increase, objective changes at a level prompting performance concerns by others are not expected." *Id.* Further, he found Plaintiff had "[n]o limitations in the ability to conform to social expectations within the work setting" due to her "unremarkable social presentation" during the examination. *Id.* Finally, Dr. Huston opined Plaintiff was "expected to respond appropriately to work and work related pressures". *Id.*

VE Testimony

A VE appeared and testified at the hearing before the ALJ. *See* Tr. 46-47. The ALJ asked the VE to consider a hypothetical individual with Plaintiff's age, education, and vocational background who could perform a full range of sedentary work. (Tr. 46). The VE opined that such an individual could perform Plaintiff's past semi-skilled sedentary work as an insurance clerk. (Tr. 46-47).

ALJ Decision

In a written decision dated May 9, 2018, the ALJ first found Plaintiff met the insured status requirements through December 31, 2020, and had not engaged in substantial gainful activity since the alleged onset date (February 4, 2015). (Tr. 15). He concluded Plaintiff had severe impairments

of: obesity, degenerative disc disease of the cervical spine, status-post surgery, and degenerative disc disease of the lumbar spine, but found these impairments (alone or in combination) did not meet or medically equal the severity of a listed impairment. (Tr. 16-17). The ALJ then found Plaintiff had the residual functional capacity ("RFC") to perform a full range of sedentary work. (Tr. 18). The ALJ next concluded Plaintiff was: "capable of performing past relevant work as an insurance clerk (DOT#219.387-014), having a sedentary exertional level designation and a specific vocational preparation factor of four. This work [did] not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565)." (Tr. 22). Therefore, the ALJ found Plaintiff not disabled from the alleged onset date (February 4, 2015) through the date of the decision. (Tr. 23).

## STANDARD OF REVIEW

In reviewing the denial of Social Security benefits, the Court "must affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). "Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Besaw v. Sec'y of Health & Human Servs.*, 966 F.2d 1028, 1030 (6th Cir. 1992). The Commissioner's findings "as to any fact if supported by substantial evidence shall be conclusive." *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (citing 42 U.S.C. § 405(g)). Even if substantial evidence or indeed a preponderance of the evidence supports a claimant's position, the court cannot overturn

"so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

**STANDARD FOR DISABILITY**

Eligibility for benefits is predicated on the existence of a disability. 42 U.S.C. §§ 423(a), 1382(a). "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 20 C.F.R. § 404.1505(a); *see also* 42 U.S.C. § 1382c(a)(3)(A). The Commissioner follows a five-step evaluation process—found at 20 C.F.R. § 404.1520—to determine if a claimant is disabled:

1. Was claimant engaged in a substantial gainful activity?

2. Did claimant have a medically determinable impairment, or a combination of impairments, that is "severe," which is defined as one which substantially limits an individual's ability to perform basic work activities?

3. Does the severe impairment meet one of the listed impairments?

4. What is claimant's residual functional capacity and can claimant perform past relevant work?

5. Can claimant do any other work considering her residual functional capacity, age, education, and work experience?

Under this five-step sequential analysis, the claimant has the burden of proof in Steps One through Four. *Walters*, 127 F.3d at 529. The burden shifts to the Commissioner at Step Five to establish whether the claimant has the residual functional capacity to perform available work in the national economy. *Id.* The ALJ considers the claimant's residual functional capacity, age, education, and past work experience to determine if the claimant could perform other work. *Id.* Only if a claimant satisfies each element of the analysis, including inability to do other work, and

meets the duration requirements, is she determined to be disabled. 20 C.F.R. §§ 404.1520(b)-(f); *see also Walters*, 127 F.3d at 529.

**DISCUSSION**

Plaintiff alleges the ALJ erred in three ways when he evaluated her claim. First, she alleges he failed to properly evaluate her obesity in accordance with Social Security Ruling 02-1p. Second, she alleges the ALJ failed to properly evaluate her subjective symptoms. Finally, she contends the ALJ improperly concluded she could return to her past work as an insurance clerk because he failed to account for all of her limitations. The Commissioner responds that the ALJ's decision is adequately supported in each instance. For the following reasons, the undersigned agrees and affirms the Commissioner's decision.

<u>Obesity</u>

Obesity is defined as "a complex, chronic disease characterized by excessive accumulation of body fat." SSR 02-1p, 2002 WL 34686281, at *2. When establishing the existence of obesity, the ALJ will "rely on the judgment of a physician who has examined the claimant and reported his or her appearance and build, as well as weight and height." *Id.* at *3. Although obesity is no longer considered a listed impairment, it is considered a medical impairment, so it must be considered at each step of the ALJ's analysis. *Id.* at *1; *see also Miller v. Comm'r of Soc. Sec.*, 811 F.3d 825, 834 (6th Cir. 2016). This is because "the combined effects of obesity with other impairments can be greater than the effects of each of the impairments considered separately." SSR 02-1p, 2002 WL 34686281, at *1. Specifically, the ALJ must consider "the effect obesity has upon the individual's ability to perform routine movement and necessary physical activity within the work environment" and an individual's ability to sustain a function over time when formulating the RFC. *Id.* at *6. However, the "ALJ is not required to use any 'particular mode of analysis' in

assessing the effect of obesity." *Shilo v. Comm'r of Soc. Sec.*, 600 F. App'x 956, 959 (6th Cir. 2015) (quoting *Bledsoe v. Barnhart*, 165 F. App'x 408, 411-12 (6th Cir. 2006)).

Here, the ALJ expressly considered Plaintiff's obesity at different stages of the sequential evaluation:

> In reaching the conclusion that the claimant's impairments do not rise to listing level, I considered the effect her obesity has on her other impairments and on her ability to perform routine movement and necessary physical activity within the work environment. I also considered how her obesity might cause fatigue that would affect her ability to function physically pursuant to Social Security Ruling 02-1p. Because the physical examinations contained in the record were mostly unremarkable, I do not find that the claimant's obesity either singularly or in combination with her other medically determinable severe impairments results in limitations greater than those assessed in this opinion.
>
> \*\*\*
>
> In terms of the claimant's alleged obesity, she recorded a body weight of 283 pounds on February 26, 2015 (3F/21), which corresponds to a body mass index in excess of forty-four. In turn, this is consistent with a body weight of 295 pounds, recorded on May 17, 2016 (11F/4), and a body weight of 260 pounds, recorded on January 28, 2018 (14F/1). Although no direct medical evidence indicates that the existence of this impairment causes the claimant excess fatigue, or unduly restricts her ability to move about freely within the workplace, I nevertheless identify this impairment as severe for its contributory effects, potentially marked, on the claimant's other severe impairments, particularly those affecting her weight bearing, musculoskeletal impairment.

(Tr. 17-18).

The undersigned finds this explanation is more than sufficient to satisfy the ALJ's regulatory burden under SSR 02-1p. Notably, after first concluding her obesity was a severe impairment at Step Two (Tr. 16), he expressly considered "the effect her obesity has on her other impairments and on her ability to perform routine movement and necessary physical activity within the work environment" at Step Three (Tr. 17). *Miller*, 811 F.3d at 834 ("Social Security Ruling 02-1p requires an ALJ to consider obesity at steps two through five of the sequential evaluation process[.]"). Specifically, the ALJ concluded that "the physical examinations contained in the record were mostly unremarkable" (Tr. 17), and "no direct evidence indicates

that the existence of this impairment causes the claimant excess fatigue, or unduly restricts her ability to move about freely within the workplace[.]" (Tr. 18). These conclusions are supported by substantial evidence. For example, treatment notes during the relevant period consistently noted a normal gait (Tr. 273, 275, 291, 418, 432, 444, 448, 453, 458, 463), normal range of motion in Plaintiff's neck (Tr. 342, 354) and lower extremities (Tr. 273, 304, 432), and negative straight leg raises (Tr. 291, 304, 444, 448, 453, 458, 463). She also denied any shortness of breath, *see* Tr. 272, 275, 290, 304, and testified she could walk for fifteen to twenty minutes at a time, Tr. 38-39. Nevertheless, the ALJ acknowledged the "contributory effects" obesity had on Plaintiff's other impairments, "particularly those affecting her weight bearing, musculoskeletal impairment." (Tr. 18). The ALJ accommodated these limitations by finding Plaintiff capable of sedentary work which requires only a limited amount of lifting, walking, and standing. *See* 20 C.F.R. § 404.1567(a).

Plaintiff alleges this analysis is insufficient because the ALJ "failed to consider the [e]ffects her obesity had on her lumbar and cervical spine limitations", citing her continued complaints of neck and back pain in support. (Doc. 12, at 10). However, a review of the decision reveals the ALJ expressly considered these ailments when he concluded Plaintiff's "obesity either singularly or in combination with her *other medically determinable severe impairments"* did not "result[] in limitations greater than those assessed in th[e] opinion." (Tr. 17) (emphasis added). It is clear the ALJ was referring to Plaintiff's "lumbar and cervical spine limitations" here because, at Step Two, he found Plaintiff's cervical and lumbar degenerative disc disease to be *severe* impairments. (Tr. 16). Moreover, Plaintiff fails to point to any evidence that her obesity worsened either of these conditions. *See Caldwell v. Comm'r of Soc. Sec.*, 2017 WL 957538, at *6 (E.D. Ky.) (finding Plaintiff failed to show the RFC was unsupported because he "ha[d] not identified any additional

limitations that should have been incorporated because of his obesity, but were not"). As discussed, the ALJ considered the effects Plaintiff's obesity had on her cervical and lumbar conditions and accommodated her by limiting her to sedentary work.

For these reasons, the undersigned finds no error here and concludes the ALJ satisfied the requirements of SSR 02-1p.

Subjective Symptom Analysis

Plaintiff next argues the ALJ's assessment of her subjective symptoms is not supported by substantial evidence. Specifically, she notes that the ALJ erred by only providing the "boiler plate" subjective symptom analysis in his decision "without discussing any of the evidence which was contrary to his finding[.]". (Doc. 12, at 14). For the following reasons, the undersigned affirms.

When a claimant alleges impairment-related symptoms, the Commissioner follows a two-step process to evaluate those symptoms. 20 C.F.R. § 404.1529(a); SSR 16-3p, 2017 WL 5180304, *2-8.[1] First, the ALJ must determine whether there is an underlying medically determinable physical or mental impairment that could reasonably be expected to produce the claimant's symptoms, *e.g.*, pain. SSR 16-3p, 2017 WL 5180304, *3-4. Second, the ALJ must evaluate the intensity and persistence of the claimant's symptoms to determine the extent to which those

---

1. SSR 16-3p replaces SSR 96-7p and applies to ALJ decisions on or after March 28, 2016. *See* 2017 WL 5180304, at *1, 13. The ALJ's decision here is dated May 9, 2018 and thus SSR 16-3p applies. SSR 16-3p clarifies the language of the pre-existing standard in SSR 96-7p, 1996 WL 374186 (1996) to the extent that it "eliminated the use of the term 'credibility' in the sub-regulatory policy and stressed that when evaluating a claimant's symptoms the adjudicator will not 'assess an individual's overall character or truthfulness' but instead 'focus on whether the evidence establishes a medically determinable impairment that could reasonably be expected to produce the individual's symptoms and given the adjudicator's evaluation of the individual symptoms, whether the intensity and persistence of the symptoms limit the individual's ability to perform work-related activities....'" *Huigens v. Soc. Sec. Admin.*, 718 F. App'x 841, 848 (11th Cir. 2017) (quoting *Hargress v. Soc. Sec. Admin.*, 874 F.3d 1284, 1289-90 (11th Cir. 2017) (quoting in part SSR 16-3p)). Both rulings refer to the two-step process in 20 C.F.R. § 404.1529(c).

symptoms limit the claimant's ability to perform work-related activities. *Id.* at *3, 5-8. To evaluate a claimant's subjective symptoms, an ALJ considers the claimant's complaints along with the objective medical evidence, information from medical and non-medical sources, treatment received, and other evidence. *Id.* at *5-8. In addition to this evidence, the ALJ must consider the factors set forth in 20 C.F.R. § 404.1529(c)(3). *Id.* at *7-8. Those factors include daily activities; location, duration, frequency, and intensity of pain or other symptoms; factors that precipitate and aggravate the symptoms; type, dosage, effectiveness, and side effects of any medication taken to alleviate pain or other symptoms; treatment, other than medication for relief of pain or other symptoms; measures other than treatment a claimant uses to relieve pain or other symptoms, *e.g.*, lying flat on one's back; and any other factors pertaining to a claimant's functional limitations and restrictions due to pain or other symptoms. 20 C.F.R. § 404.1529(c)(3). Although the ALJ must "consider" the listed factors, there is no requirement that he discuss every factor. *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 287 (6th Cir. 2009).

The Sixth Circuit has explained, interpreting SSR 96-7p, the precursor ruling, that "an administrative law judge's credibility findings are virtually unchallengeable". *Ritchie v. Comm'r of Soc. Sec.*, 540 F. App'x 508, 511 (6th Cir. 2013) (internal citation omitted). Nevertheless, the ALJ's decision "must contain specific reasons for the weight given to the individual's symptoms, be consistent with and supported by the evidence, and be clearly articulated so the individual and any subsequent reviewer can assess how the adjudicator evaluated the individual's symptoms." SSR 16-3p, 2017 WL 5180304, at *10.

Here, the ALJ correctly identified the two-step process (Tr. 18), summarized Plaintiff's medical records (Tr. 18-22), and offered a thorough assessment of her subjective physical symptoms:

After careful consideration of the evidence, I find that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity, persistence and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision.

\*\*\*

The claimant has followed a regimen of prescription, non-narcotic, medications intended to address this impairment (2E/5), (4E/8), used without side effects (4E/8) and said to be at least partially helpful in remediating her symptoms (10F/2), (16/5).

The claimant has also reported partial relief of symptoms with the use of non-medicinal palliatives, including heat and stretching (16F/5) and a transcutaneous electrical nerve stimulator (16F/l).

\*\*\*

Clinical examinations included in the record have consistently, albeit not universally, reported either mildly adverse, or normal findings, including one dated February 26, 2015, which indicated normal range of motion, gait, station, strength, tone, motor and sensory function (3F/21), one dated December 5, 2016, which reported normal gait, and normal range of motion of all extremities (l5F/9), or one dated January 23, 2018, which reported tenderness of the paraspinal musculature, and equivocal straight leg raises, with decreased extension, but otherwise normal range of motion and stability, with normal strength, gait, reflexes and no focal neurological deficits (14F/6-7).

As to the claimant's physical impairments, I must also note the assessment of her surgeon that the claimant was markedly deconditioned (6F/2), despite several iterations of medical advice to increase her activity (12F/5), (16F/3), such that an element of volition is present in the claimant's symptomology.

In sum, the evidence would indicate that the symptom limitations relevant to these impairments are not as severe as alleged. In a setting where the claimant would be restricted to the performance of work at the sedentary exertional level, adequate allowance will have been made for these impairments.

At one point or another in the record (either in forms completed in connection with the application and appeal, in medical reports or records, or in the claimant's testimony), the claimant has reported the following daily activities: although not without difficulty, the claimant described the ability to attend to her own bathing, grooming, dressing and toileting. She concedes engagement in typical household chores, including meal preparation, and that she drives, shops, runs errands, engages in hobbies and social interaction (4E/9). This would be consistent with her report that she maintained an independent household (3F/20), for at least a part of the period relevant to this claim. Episodically, at least, the claimant has walked for exercise (15F/3). In short, the claimant has described daily activities, which are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations. While none of these activities, considered in isolation, would

warrant or direct a finding of "not disabled"; when considered in combination, they strongly suggest that the claimant would be capable of engaging in the work activity contemplated by the residual functional capacity.

(Tr. 18, 19-20). The undersigned finds this explanation satisfies the ALJ's regulatory burden because it addresses many of the required factors and is supported by substantial evidence.

First, the ALJ noted Plaintiff had partial symptom relief from "non-medicinal palliatives" including heat, stretching, and a TENS unit. (Tr. 20). This assertion touches on a regulatory factor, 20 C.F.R. § 404.1529(c)(3)(v) ("Treatment, other than medication, you receive or have received for relief of your pain or other symptoms"), and is supported by the record. *See* Tr. 319, 383 (symptom relief from heat); Tr. 442, 446 (symptom relief from heat and stretching); *see also Johnson v. Comm'r of Soc. Sec.*, 535 F. App'x 498, 507 (6th Cir. 2013) ("In general, it is appropriate for the ALJ to consider a claimant's treatment (other than medication) in evaluating his or her symptoms and pain[.]"). The ALJ next pointed to "mildly adverse, or normal findings" throughout the record. (Tr. 20). He specifically cited a February 2015 examination showing Plaintiff had a normal gait, strength, tone, and stature, *id*. (citing Tr. 245), another examination from December 2016 showing a normal gait and full range of motion in her extremities, *id*. (citing Tr. 430), and a January 2018 examination showing the same, *id*. (citing Tr. 418). It was entirely proper for the ALJ to consider this objective medical evidence in making his determination. 20 C.F.R. § 404.1529(c)(2) (an ALJ must consider "evidence obtained from the application of medically acceptable clinical and laboratory diagnostic techniques, such as evidence of reduced joint motion. . . or motor disruption"). The ALJ also properly considered Plaintiff's activities of daily living which was consistent with her reporting she was able to "maintain[] an independent household". (Tr. 20); 20 C.F.R. § 404.1529(c)(3)(i) (daily activities as a factor the adjudicator must consider); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007) (same). This is also

supported by the record. *See* Tr. 37-38 (Plaintiff's testimony she cooked simple meals and grocery shopped); Tr. 333 (Plaintiff reported cleaning prior to her appointment and performing household chores "with help"); Tr. 424 (Plaintiff reported walking "for about a month and tolerat[ed] it well").

Plaintiff further asserts the ALJ's decision was legally flawed because the "justification for his decision" was that he found "an element of volition" in her symptomology. (Doc. 12, at 13). She (inaccurately) states that the ALJ's cited records do not mention the need for her to stay active, (Doc. 12, at 13), when indeed they do. *See* Tr. 20 (citing Tr. 385 ("I advised patient to stay strong and active, avoiding bed rest."); Tr. 464 ("Keep active as possible")). By his statement, it appears the ALJ suggested that Plaintiff failed to follow prescribed treatment when she, of her own volition, did not lose weight as recommended. If Plaintiff's failure to follow this advice was the ALJ's *only* justification for discounting her subjective symptom reports, such an analysis would indeed be legally deficient and require remand. This is so primarily because "[a] treating source's statement that an individual "should" lose weight or has "been advised" to get more exercise is not prescribed treatment." SSR 02-1p, 2002 WL 34686281, at *9 ("We will rarely use 'failure to follow prescribed treatment' for obesity to deny or cease benefits."); *Burnside v. Comm'r of Soc. Sec.*, 2010 WL 3609379, at *1-2 (W.D. Mich.) (finding an ALJ's credibility determination supported where he provided other "proper bases" for the finding and "did not rely on noncompliance with treatment in making the credibility determination" regarding an obese claimant). Because the ALJ provided a thorough subjective symptom analysis apart from referencing weight loss, and his reasons are consistent with and supported by the evidence, the undersigned finds no error and affirms.

Step Four

Finally, Plaintiff argues the ALJ erred at Step Four when he concluded she could return to her past work as an insurance clerk. The undersigned disagrees and affirms.

An ALJ determines a claimant's RFC at Step Four of the sequential evaluation. A claimant's RFC is an assessment of "the most [she] can still do despite [her] limitations." 20 C.F.R. § 404.1545(a)(1). An ALJ must consider all symptoms and the extent to which those symptoms are consistent with the objective medical evidence *Id.* § 404.1529. While an ALJ must also consider and weigh medical opinions, the RFC determination is expressly reserved to the Commissioner. *Ford v. Comm'r of Soc. Sec.*, 114 F. App'x 194, 198 (6th Cir. 2004); 20 C.F.R. §§ 404.1527, 404.1546. The Court must affirm "so long as substantial evidence also supports the conclusion reached by the ALJ" even if substantial evidence or indeed a preponderance of the evidence *also* supports a claimant's position. *Jones*, 336 F.3d at 477.

The ALJ is also charged with making a determination regarding a claimant's ability to perform past relevant work at Step Four. 20 C.F.R. § 404.1520(a), (f). If she can perform past relevant work she is found to be not disabled and the analysis ends. *Id.* If an ALJ relies on a VE's testimony in response to a hypothetical question to provide substantial evidence, that hypothetical must accurately portray the claimant's limitations. *Ealy v. Comm'r*, 594 F.3d 504, 516-17 (6th Cir. 2010); *see also Webb v. Comm'r of Soc. Sec.*, 368 F.3d 629, 633 (6th Cir. 2004) (explaining that although an ALJ need not list a claimant's medical conditions, the hypothetical should provide the VE with the ALJ's assessment of what the claimant "can and cannot do"). The ALJ is only required to include in his hypothetical those limitations he finds credible. *Casey v. Sec'y of Health & Human Servs.*, 987 F.2d 1230, 1235 (6th Cir. 1993) ("It is well established that an ALJ may pose

hypothetical questions to a vocational expert and is required to incorporate only those limitations accepted as credible by the finder of fact.").

Here, the hypothetical question posed to the VE by the ALJ was identical to the RFC, and the VE determined the hypothetical individual would be able to perform Plaintiff's past relevant work as an insurance clerk. (Tr. 46-47). Plaintiff argues, rather fleetingly, that the ALJ should have limited her to unskilled work due to anxiety and should have included such, as well as a handling and fingering limitation, in the RFC (and in turn, the hypothetical). (Doc. 12, at 15-17). However, the only evidence she offers in support of mental limitations on her ability to work is Dr. Huston's opinion that she "*may* experience a subjective sense of reduced effectiveness" in her ability to maintain attention and concentration. *Id*. at 15 (quoting Tr. 336) (emphasis added). Notably, Plaintiff leaves out the passage in Dr. Huston's notes immediately following where he concluded that this would occur *only* "should her anxiety symptoms increase" and that any "objective changes at a level prompting performance concerns by others are not to be expected." (Tr. 336). Plaintiff also does not point to *any* evidence, other than her own testimony, to support a handling and fingering limitation. *See* Doc. 12 at 15-18. At Step Four of the evaluation, a claimant has the burden to prove disability. 20 C.F.R. § 404.1512(a). She falls far short of that here.

Moreover, Plaintiff's attorney never asked the VE any questions regarding handling and fingering, nor any mental health limitations, at the hearing. *See* Tr. 46-47. Absent such objections, the ALJ reasonably relies on the VE's testimony. *Staymate v. Comm'r of Soc. Sec*., 681 F. App'x 462, 468 (6th Cir. 2017); *see also Sims v. Comm'r of Soc. Sec.*, 406 F. App'x 977, 982 (6th Cir. 2011) ("Yes, the vocational expert's testimony could have been further refined; but as the district court pointed out, plaintiff's counsel had the opportunity to cross-examine, but asked only one question and did not probe the deficiency now identified on appeal.").

Though Plaintiff points to evidence which she believes support a greater RFC, as thoroughly discussed above, the RFC is supported by the physicians of record, imaging, and Plaintiff's testimony. Therefore, it must be affirmed. Consequently, the ALJ's decision to exclude mental, and handling and fingering limitations from the hypothetical is supported. He appropriately posed a hypothetical question to the VE and relied upon his responses to conclude Plaintiff was capable of performing her past relevant work as an insurance clerk. The Step Four determination is therefore supported by substantial evidence.

## CONCLUSION

Following review of the arguments presented, the record, and the applicable law, the undersigned finds the Commissioner's decision denying DIB supported by substantial evidence and affirms that decision.

 s/ James R. Knepp II
United States Magistrate Judge